Our next case on the call of the docket today is agenda number two, case number 111089, People v. Hunt. Counsel for the appellant. Good morning, Mr. Chief Justice, Your Honors. My name is Susan Cheryl Sullivan. I'm a Cook County Assistant State's Attorney. Here on behalf of the people of the State of Illinois, may I please the Court. This case is about a police investigation of an intra-gang murder and attempt murder, where virtually everyone, the suspects, the witnesses, and even the surviving victim, was a fellow gang member or an associate of the gang, and no one was committed to the truth. In the midst of this investigation, the police were offered an opportunity to get defendant on tape making a second confession to a fellow gang member, Mikel Davis. They got a judicially approved over here, and they put him in a room with his fellow gang member, Mikel Davis, and they got him on tape. Specifically, what's at issue in this case is whether the McCauley right to counsel applies to the use of this investigatory tool. Unlike many constitutional rights, the McCauley right to counsel is not freestanding. It only arises under certain constitutional conditions precedent. It serves as a prophylactic to protect the constitutional right against compelled self-incrimination, so it doesn't even come into existence unless and until there are certain constitutional conditions in the interaction between the police and the suspect. The Constitution strikes a balance during the pre-charge phase, the investigatory phase of a criminal prosecution. It strikes it differently than it does in the post-charge after the initiation of adversarial judicial proceedings. It strikes the balance between the suspect's rights and society's right to the truth. This balance actually fosters both the inculpation of the guilty and the exoneration of the innocent. We can't forget that. That's a very significant component of this investigatory phase. And the facts of this case poignantly demonstrate that. In this case, the police were met with an orchestrated plan by no less than six witnesses to put a defendant's case on an innocent man, Nicholas Mobley. And through good police work, plain and simple, they were able to exonerate Nicholas Mobley and also ascertain that defendant was in fact the true offender. One of the tools they used in what's at issue in this case is a judicially approved confidential overhear. The defendant says, and the appellate court says, that somehow they were desperate to use this confidential overhear because they needed to extract a confession from defendant at all costs. But that's not really what happened. Once you contextualize the investigation, it becomes very clear that it served two purposes in this case. Number one, it served to fact check Mikel Davis himself. Mikel Davis was one of the original six witnesses that put the case on Nicholas Mobley. He ends up in custody with defendant. During the aborted lineup on July 16th, they end up in the bullpen together. Defendant confesses to him. Mikel Davis comes to the police and he says, I can get him on tape. Well, Mikel Davis is also in jail on his own unrelated offense and looking at considerable time. So they want to fact check him, and that's just good police work. And it also serves the purpose of getting defendant himself on tape a second time. This confession of Mikel Davis, while it's evidence, it's actually better evidence to get him on tape. But there's no sense of desperation and no need to extract a confession from defendant. It's just good police work in this case to put him on tape. Could I ask a question, a fact question? Were the tapes admitted into evidence? The tapes were suppressed based on inaudibility. So the tapes are really not at issue here? The tapes are not at issue. The content of the conversation, though, is at issue. The witness would have to be called? Mikel Davis or there's the overhears being conducted through the police officers themselves also could testify to the content. They're listening while the overhear is going on. So the police officers would be called as witnesses as to what the defendant said? Potentially. There would be other potential litigation that may take place pre-trial with respect to that. But in terms of that substantive evidence, it's definitely on the table right now. The tapes themselves are inaudible, but the content of the conversation is what we're talking about here today. Now, the lower courts and defendants say that this use of the COH in this case violates Illinois' pre-charge right to McCauley Counsel. But again, the McCauley right to counsel only comes into existence and is only constitutionally justified under certain conditions precedent. It serves to shield the constitutional right against compelled self-incrimination, not just incrimination of any type. And that's what this court in Manning found. That's what the U.S. Supreme Court in Illinois v. Perkins found. It found that in the context of the police suspect interaction of the context between a jailhouse informant, an incarcerated defendant, there's no constitutional compulsion. Without constitutional compulsion, the self-incrimination clause isn't jeopardized and therefore no pre-charge right to counsel. You do not think that it is inherently coercive to be brought to the county jail to a police station? No. In the constitutional sense, Your Honor, which is my point. The coercion and the compulsion that's at issue in this case is a constitutional term of art. It's the end result, the very danger that for which the pre-charge right to counsel and McCauley right to counsel serves to protect. It serves as a shield for the right against compelled, and that's the coercive component we're talking about, self-incrimination. So the currently accepted measurement for the existence of this pre-charge is two-pronged. It's custodial and it's interrogation. And, again, a constitutional term of art. Without both of these, there's no McCauley right to counsel. Without both, even if counsel is physically present at the station, McCauley can't be violated because it doesn't exist. This Court's own precedent bears it out. McCauley itself, this Court, the same, the very same physically present counsel, this Court found he had a right to counsel, McCauley right to counsel, during the custodial interrogation, and no right during the lineup. And that's because the lineup doesn't endanger the constitutional right against compelled self-incrimination. In the custodial interrogation context, that's where the right to counsel arises. Lovejoy, again, this Court said it rejected McCauley-based argument based on the facts in that case. It said there's no Miranda custody during the interview, so no McCauley right to counsel. And, again, in Villalobos, this Court also, in rejecting the principle of anticipatory invocation, this Court said when custodial interrogation isn't at issue or at least imminent, and that's a component of our jurisprudence in Illinois, the imminency of custodial interrogation, then there's no constitutional right to counsel during this phase of the criminal investigation. Help me to understand your argument that the defendant was not in custody during this time. Is it tied to this coercive custody or coercive situation that you're talking about because he was clearly in custody, he wasn't free to go? He was in custody as an incarcerated pretrial detainee on unrelated offense. That's actually, Your Honor, what Schatzer is about and what this Court discussed in Patterson, but really, and I will discuss it, but really that's kind of more of an open question, this custody thing, and it's currently pending before the U.S. Supreme Court in Howes v. Fields, and that's number 10-680, and it was argued October 4th. So the custody question really is somehow a way to ascertain over and above the baseline restraints of being incarcerated. Schatzer says that's a necessary component, but it's not enough and it needs more in this Court, and Patterson said it compares the relative freedom of movement from where he is located and then the circumstances, the objective circumstances of the interview itself. And in Patterson, he was actually interviewed in handcuffs and this Court found no Miranda custody because he was an incarcerated suspect coming from segregation. In this case, if we look at the objective circumstances of the interaction between Michael Davis and this defendant, it's perfectly voluntary, perfectly comfortable. They're even comparing notes. They're comparing notes on the offense. They're finding out what the police know, what do they know, what's going on. And even at the end, they kind of try to concoct a little plan to put this case now on another guy. They want to put it on Donald Shaw. So he's definitely not in the sense of that sort of coercive custody that Miranda custody requires. So specifically with respect to the interrogation component of the two conditions precedent, both defendant and the appellate court want to redefine it. They want to redefine it in such a way that they extricate the requisite constitutional compulsion. The appellate court does it by retroactively applying a statute that this court found doesn't retroactively apply in this case. And that's one of the arguments. But the real argument is that this statute that governs the requirement that the police videotape custodial interrogations, according to the appellate court, any questioner, any questioner can be an interrogator. So that means a spouse, a priest, defense counsel himself by that definition. It wasn't just any interrogator. It was somebody who was wired purposely. Well, he wasn't being interrogated because that's in the constitutional sense. And he was having a conversation with a fellow gang member. It was prepped to ask certain questions. He was to get a confession from defendant, to get defendant to repeat a confession that he already made so that they can have it on tape. But that's not the benchmark for the right to counsel in Illinois. Or under the federal constitution, the benchmark for this pre-charge right to counsel is custodial interrogation. And under the current definition of interrogation, that's not what happens between a jailhouse informant and an incarcerated defendant. This court itself held that in Manning. So if we find that he was in custody, you would still argue that he was not interrogated? Absolutely. And perhaps the interrogation condition is actually the real primary basis of our argument. Because that's where the defendant and the appellate court want to completely redefine the law in Illinois. The appellate court, as I said, using this statute, wants to take the identity of the questioner out of the equation. What defendant wants to do is he wants to turn interrogation inside out. If defendant, if this court accepts defendant's definition of interrogation in Illinois, a suspect can now be, quote, interrogated without his knowledge. And that's contrary to all existing precedent, it's contrary to the very rationale for the existence of the McCauley right to counsel. It takes the effect of compulsion on the suspect out of the constitutional framework. It's no longer the benchmark. What the new benchmark is under defendant's definition is the questioner's uncommunicated intent. And that's just not the way that this entire paradigm, the entire Moran regime and the McCauley right works. It's the effect of the compulsion on the suspect that's a significant thing, because that's what endangers the constitutional right against compelled self-incrimination. So make no mistake about it, Your Honors. Defendant is really asking this court to provide a new right to counsel. Once his claim is laid bare, once we peel away everything that he says, that's the essence of his argument. And he makes it very clear on page 21 in his brief when he admits perfectly legitimate investigation up until the point of the arrival of counsel. So this right according to defendant is going to arise whenever counsel appears at the station. It's a right of counsel, not a right of defendant. And it's a right to interrupt an otherwise perfectly constitutional police investigation. So long as under defendant's definition the following conditions precedent exists. An already incarcerated suspect comes, quote, under investigation by law enforcement, end quote, at a police station. So no matter how he dresses it up, he wants to convert this prophylactic right that stands sentry over the constitutional right against compelled self-incrimination into a right that protects a suspect from himself and his own hubris. Nowhere in the Constitution are we obligated. Nowhere does it say that we have to protect suspects from themselves. The right is against compelled self-incrimination, and that's not in this case necessarily. And the interaction between a jailhouse informant and a suspect is not constitutionally compelled. There's no end run around the Constitution here. It's just plain old good police work, the use of all the legitimate constitutional investigatory tools at their disposal. In the context of this case in particular, it was good police work to use the COH. That's what they did. They followed the investigation. Mike Heldavis presented himself to them. And it's perfectly constitutional. Your Honor, we ask this Court to validate that. And we ask this Court to reverse the appellate court's decision upholding both of the overhears in this case. Can we just touch upon the 14-day rule before you sit down? The 14-day rule, Your Honor, it comes from Schatzer, the United States Supreme Court decision in Schatzer. And what, before Schatzer, conceptually, the Miranda right to custody could exist in person. There's no perpetuity for incarcerated defendants. Because if it's perceived as just the state of being incarcerated is per se Miranda custody, there's no stopping off point unless and until they're released from prison. So in Schatzer, the guy invoked counsel, and the Edwards immunity that comes with that, survived for two and a half years because he was incarcerated on another offense. What Schatzer says is 14 days, it's a bright line rule. They say it's enough to shake off sort of the coercion inherent in the initial custodial interrogation. And so the duration of the Edwards presumption is a 14-day duration. And here your position is that the latest there could have been was the May 18th date? May 18th, and there absolutely was no invocation during that interview either, Your Honor. But for the sake of argument, that's the only date that he potentially could have invoked his. The defendant's position would be July 18th? Well, defendant's position is a little fuzzy on that. I don't think he takes an actual position. He kind of says it could be May 18th, could be July 18th, could be the phone call, could be any time you guys want to find that I invoked counsel. So your position is there's no facts and evidence to indicate that it, if at all, it would have to have been on the 18th? There's no facts at all. As a matter of fact, everything points to the opposite. Can I ask you this? Didn't the defendant testify? The defendant did testify. So there is evidence in the record that he invoked his right to counsel on July 18th? There is, Your Honor. I apologize. There is evidence in the record. There's no, at the end of the day, once this Court accounts for the entire body of evidence in this case, there's really no legitimate way to find that he factually invoked counsel. Despite the trial court's finding? The trial court's finding is not necessarily what it's being presented. The trial court did say that, but if you take a look at the whole series of statements and rulings and vacator and all that stuff that the trial court did, especially if you take a look at the real ruling, the real basis of the ruling, if the trial court really thought the defendant invoked counsel earlier, this would have been an Edwards case. This wouldn't have been a McCauley case because the presumption of the invocation of counsel would have been the thing that was litigated. Everyone litigated McCauley in this case because the belief that he didn't invoke any counsel. In fact, perhaps the strongest evidence of that, Your Honor, defendant's own counsel, who also testified in this case, said from his notes, he didn't invoke until July 31st, after I talked to him after the overhear. So yes, there is evidence, Your Honor, but really there's no way that that body of evidence supports a factual finding of invocation in this case. Thank you, counsel. Your time has expired. Thank you. Counsel for the appellee. Good morning. Chief Justice McBride, members of the court, may it please the court, my name is Jack Rimland. I am counsel for Tavares Hunt and have been his counsel since the very inception of this case back in 2003. I participated personally in the motion to suppress. I was present during the proceedings that occurred back in those days, and some of the questions that have just been asked by the court, I think I'd like to address immediately so I don't forget them. And Mr. Rimland, I want to ask a question before I forget it. And I think maybe you're going to address it, because the last area of inquiry was this 14-day rule. And I don't really even see where you defend July 18th. It seems more your position is that you don't think the date matters. Am I wrong on that? No, you're absolutely correct, Your Honor. Although there was testimony by the defendant himself at the hearing that he invoked his right to counsel on or about July 18th. He testified that it could have been the 17th, could have been the 16th, he wasn't quite sure. It was the date that was presented as far as the statement of facts are concerned in the record by the state when they referenced the fact that there was an admission by the police that there was supposed to be a procedure that was going to occur in mid-July. The first one was in mid-May, May 18th, May 17th, 18th, or 19th, I forget which one of those two. So the first time he was brought over was in mid-May. There was, in fact, no question about it, a custodial interrogation conducted by the police. In that testimony and on that date, Hunt testified personally that he invoked his right to counsel. Subsequently, there was another time when he was, according to his own testimony, where he was brought over from the Cook County Jail over to Area 4, again, for purposes of what the police said was going to be a lineup, but turned out to be an aborted lineup because they couldn't get witnesses or some such thing. So that, on that date, he again testified that he invoked his right to counsel. The police disagreed with that. Judge Surya made a well-reasoned decision based upon not only the testimony of Hunt, but the testimony of Chris Anderson, who was the assistant public defender representing Hunt, on the unrelated charge that he was incarcerated for in the Cook County Jail. Because what had happened was, and to support the findings of Judge Surya, in this case, Chris Anderson testified at the hearing. Chris Anderson testified that sometime in late June, when he was first appointed to represent Hunt on the unrelated case, that at that time he had a discussion with Hunt in the bullpen, and this corroborates Hunt's testimony, that Hunt was being taken out of the county jail. I forget the exact words that he used at the time. Snatched out, I think, was Hunt's testimony, and brought over to Area 4 for questioning with regard to an unrelated homicide. So there was a brief discussion between Hunt and Anderson at that time with respect to what his rights were, what he should do, what he shouldn't do. Anderson testified that he recalled Hunt asking him, and he recalled that his common response would have been, under those circumstances, well, whatever you do, don't talk to the police without a lawyer. And so from there, Judge Surya made certain determinations based upon his ability to observe the demeanor of the witnesses, his ability to weigh the evidence, to determine whether or not these witnesses were telling the truth and or what weight should be accorded to their testimony. The State points to nothing, not a single scintilla of the fact or inference, that Judge Surya did anything but conduct himself as a seasoned, experienced trial court judge and make a determination of the evidence based upon not only the facts that were presented, but the inferences that were drawn therefrom. The State nowhere says that there was an abuse of discretion, that it was against the manifest weight of the evidence, but in no writings that I've seen nor have I heard today, the State pointing to anything saying that Judge Surya abused his discretion and this is how he did it. So that as far as an answer to the court's question, when he invoked his right to counsel, in my humble estimation, is really not all that important because we're not relying on Schatzer. What we're relying on is McCauley. That's why we're here. This case is clearly a McCauley violation. McCauley stood for the proposition that there was a denial of access to counsel in that case and as a result of the denial of access to counsel, that turned into a due process violation. The due process violation, of course, being the interference by the police with the defendant, with the custodial suspect's ability to communicate with counsel under circumstances where he affirmatively did everything in his power to get the lawyer present. In other words, informing Anderson prior to the July 31st over here date that he was being questioned by the police with regard to this unrelated homicide. His phone call to Anderson and there's no dispute. The State doesn't dispute that fact at all and that's an extremely important detail and, again, another detail that Judge Surya could well use as a reasonable inference that Hunt was telling the truth, that Hunt did invoke his right to counsel, notwithstanding the fact that the police may have testified that in their recollection of the circumstances that he did not invoke his right to counsel. So the fact that the police testified that he didn't invoke and Hunt testified that he did, along with the corroborated testimony of Chris Anderson, those are the circumstances that Judge Surya was faced with. The State is asking this Court, in that respect, to substitute its judgment for that of a well-reasoned finding of fact. And Judge Surya went on, of course, in his finding to suggest that what really is the problem in the case, what he determined to be the violation, was the denial of access to counsel. And that's why we're here today. We're here because he was a custodial subject. I could go on, just from my own personal experiences, seeing what happens as you go to police stations, when you try to talk to your client in pre-charge stages. I've been called many times by family members where I don't even know the defendant. I'm called to a police station. I go to that police station. I try to confer with my client. And I'm laughed at by a police officer because, ha, ha, ha, we don't have to let you see your client because he doesn't even know who you are. Those words have been used directly to me. I've been involved in situations where one time I waited literally five hours in a police station in a pre-charge situation, demanding, requesting, I want to see my client, I want to see my client. All the time I was being given excuse after excuse that, wow, we're busy, we're conducting a rape investigation, we're probably not going to charge your client anyway. I sat there with the family in that police lobby until I could finally see my client some five hours later when I finally discovered that guess who was with him? An assistant state's attorney taking confession from you. That case in the trial court resulted in a suppression of the confession. Is what the appellate court did here, counsel, over here? I'm sorry? Is what they did an extension of McCauley? I think it fits within the McCauley principle. It's not unreasonable to suspect that this could be an extension, but our position is that it's not an extension. Our position is that McCauley, what McCauley says is that any custodial suspect has a right to consult with a lawyer during the periods of time that he's being held by the police in a place that is regulated and controlled by the police. And there's no question in this case that taking him out of the jail, notwithstanding the fact that there's numerous restrictions in the county jail for movement, for freedom of mobility, et cetera, but now he's in the police station where he can't go where he wants. He can't go to the day room. He can't go watch TV. They sit him down in a room. Several hours later they bring in the informer in this case, Michael Davis, with the wire on and then go get him. And that's exactly what they did in this case. So what I'm saying is that I don't think it's an extension. Counsel, let's just talk about McCauley. McCauley is a situation where the police officers were questioning the defendant, correct? Yes. That's not true here. That is not true. The police officer is not. So we are in a different setting than McCauley, correct? In the sense that it was not a police interrogation, yes. That's counsel's argument, is that because this was not a police interrogation, then in fact McCauley doesn't apply. So why should we apply McCauley in this situation where there's not a police interrogation going on? Well, because Davis is acting as an agent of the police. The police have utilized his skills, if you will, for purposes of obtaining a confession. And obtaining the confession, of course, is done so by virtue of an interrogation. This is the any going back to the language of being a functional equivalent. There's no question that he's an agent of the police. There's no question that he's asking him direct questions that would elicit incriminating responses. So in this sense, the combination of those factors, Your Honor, in my humble opinion, causes this to be at least akin to a custodial interrogation in the sense that it's being conducted by a police officer. How about the case of People v. Manning from 1998, where this court said Miranda is not implicated in conversations between suspects and undercover agents? This case is a due process case is the best answer I can give. The chief evil in McCauley is the denial of access to counsel, which results in a violation being a due process violation. So that in terms of whether or not this is a compelled interrogation being conducted in a police-dominated atmosphere, obviously that's something that this court has to decide. But I don't think that that is the crowning glory. I think that once everyone looks at the question of custody, his restricted movements, whether or not he could obtain the flow of information that is necessary, I hope that I've answered the court's question. Although I understand and recognize that some of these cases discuss the fact that it's compelled self-incrimination, and although that was an aspect of McCauley, I think that the chief evil in McCauley is the denial of access to counsel resulting in the due process violation. Mr. Rimmel, you do say, and I believe it's a quote, that defendant was interrogated without his knowledge. Yes. Would that not redefine interrogation as we know it in the case law? No, I don't think so, because the true intent by the police officers at that time was to conduct what they believed to be an interrogation of the defendant. Whether or not Hunt knew himself that this was an informant he was dealing with, therein really lies the rub. For example, I think it's 103.4, the statute in Illinois, that discusses the opportunity for lawyers to be able to visit their clients, and I'm not suggesting that that statutory right should result in suppression of the confession. It is certainly a codification of what this state's courts determine to be a fundamental fairness. Fundamental fairness is part of the due process clause. It's that shock to conscience effort that we always envision when we talk about due process. In other words, restricting the flow of information, restricting the ability of the defendant in a custodial suspect situation to be able to obtain information. For instance, in the pre-charge stages, if a person is taken into custody, hasn't been charged yet, police haven't interrogated them yet, and there is the lawyer knocking on the door, can I please come in? Under those circumstances, what if it's the police's intention to ask the question, although they haven't done so yet, to ask the question of the defendant, may we have your consent to search your house? Wouldn't it be nice if the lawyer could get in at that point instead of him being diverted, instead of their subterfuge being employed, keeping him out so that he can confer with his client and tell his client, by the way, you don't have to consent. They have to have probable cause. One other question, a little bit off point as I see your light is on. Let's assume we were to agree with you as to the July 31st conversation. What about the August 6th conversation? Why should that be suppressed? Well, the August 6th conversation, of course, being an extension of the July 31st, but in addition there to, I guess, the other part of that argument would be the chats replies, because there's no question then, everybody apparently agrees that the August 6th conversation was within the 14 days. July 31st, even the police testified at the hearing that he, that is Hunt, invoked his right to counsel with counsel present. Mr. Rimland, with regard to the McAuley issue again, are you asking or is the state asking us to have a bright line rule whether the police are in the interrogation room or not? Because then it would always be circumvented, because in this case the police were listening during the conversation. They caused the informant to be wired, and so it could always be circumvented that way. Is that not right? I'm sorry. The McAuley violation. Right. Versus the police being in the interrogation room versus being somewhere else and listening at the time. Right, which I think speaks volumes for why this is, in fact, an interrogation. They are in another room listening, and that is a situation where maybe not necessarily a bright line rule requiring them to be in another room listening to the conversation at the same time, but it's their interference with Hunt's ability to confer with his lawyer at a time when the investigatory stage is really just as important as the rest of the case. For a lawyer in the trenches to be able to go out there and advise his client, you have a right to do this, you have a right to do that, wouldn't it be necessarily reasonable for the lawyer under these circumstances to have gone into the room, asked him, that is, asked Hunt, what have they had you doing so far? And he said, Hunt says to his lawyer, well, guess what, they've got me sitting here in a room with somebody else, another inmate. The first thing that I would do and any other reasonable lawyer would do. I'm so worried the red light is going to come on. So you're asking us to say any time the lawyer comes, whether the defendant is being interrogated or not, the lawyer has a right to see his client. Is that what you're saying? Yes. Because interrogation is not the issue here at all. Well, interrogation is an issue, but it's not the key to this situation. In other words, the key is that the police were in a position where they kept the information from my client that he could have otherwise used in a very important way for himself. Just one question. Sure. Out of curiosity, did you get a chance to hear the tape? I listened to the tapes. And it is, as the State has described it, inaudible? They are inaudible, but the way the State describes it, of course, they've gone on to suggest that they heard things that they didn't hear. I listened to the tapes with Judge Surya in his chambers, in addition to myself listening to them seven or eight times myself. Thank you. There's another question here, Justice Carmeier. To follow up, I think, on Justice Tice's question, if the police overhear a person making a confession in his cell to another individual while the police is on their way to bring him back to see his lawyer, do we have a violation? Not if that's not orchestrated by the police and not if it's a situation where the lawyer isn't outside the door asking permission to see his client. But is it the orchestrated, that's the key there? Because the lawyer has asked to see the client. The police are not interfering. They're on their way to get him, but he makes a statement that implicates himself, and the police overhear that. Not if there's not an intentional interference with the defendant's right to presence of counsel and assistance of counsel. Thank you, Counsel. Thank you. Counsel for the appellant. There's nothing constitutionally wrong with what the police did in this case. The defendant wants this court to take the Sixth Amendment right to counsel, the reason, the rationale, the purpose it serves, and convert it into and bring it backward and have it control the investigatory phase of a criminal investigation. The Constitution strikes the balances between these two different phases differently for, to serve the purposes of protecting the constitutional rights at various phases and also for society. Defendant talks about access to counsel. Actually, he says, my right to go talk to my guy. It's not the lawyer's right. The access to counsel that we're talking about in the pretrial phase is the right of the defendant that emanates from custodial interrogation. And no matter what defendant says, he even basically admits this isn't interrogation. What he says is he wants physical presence of counsel to be a stand-in for the compulsion. The compulsion is a requisite ingredient because that's what the constitutional right against compelled self-incrimination is about. And that's the very reason that this McCauley right to counsel exists in Illinois. If defendant's right, then basically counsel himself will be given an unfettered right in Illinois to just basically interrupt at will any and all police investigations that are taking place at the station with no constitutional justification. He takes compulsion out. He just says, when I show up, I want to talk to my guy, and whatever you police are doing, you need to stop. There's no constitutional basis for that. Don't recalibrate the Constitution at this phase, the investigatory phase, a defendant wants. It's already a good balance. It already serves both sides very well. If you recalibrate it the way defendant wants, it's going to swing way too far in favor of suspects at great cost to society. The facts of this case show what happens if the balance stays true. They exonerated an innocent man because they were able to investigate. The irony of this case is that defendant's own new right to counsel can't even protect him in a second over here. There was no counsel. He fired him, fired him four days before. He went in, he was advised after the first interview that don't talk to anyone. Just exactly what defendant's saying he wants this court to protect, he was afforded that. Turned around and did the same thing the second time. He did it because he wasn't compelled. He did it because he trusted, mistakenly for him, his fellow gang member. There's nothing unconstitutional about it. It's a perfectly legitimate, sometimes very necessary investigatory tool in investigation of these kinds of cases in particular. So, your honors, we ask this court to reverse the decision of the appellate court upholding the suppression of both over here in this case. Thank you, counsel. Case number 111089, People v. Tamaris Hunt, is taken under advisement as agenda number two. Mr. Marshall, the Illinois Supreme Court stands adjourned until tomorrow morning at 9 a.m.